**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| MAURA MATVEY and BENJAMIN LAGOS individually and on behalf of all others similarly situated,<br><br>PLAINTIFFS,<br><br>v.<br><br>NATIONAL AQUARIUM, INC.<br><br>DEFENDANT. | CASE NO. |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Maura Matvey and Benjamin Lagos individually and on behalf of all others similarly situated, allege as follows based on personal knowledge, the investigation of counsel, and on information and belief:

## NATURE OF THE ACTION

1. Plaintiffs bring this Class Action Complaint against Defendant National Aquarium, Inc. ("Defendant" or "National Aquarium") for its use of drip pricing tactics that mislead consumers about the true cost of tickets Defendant sells to induce them into paying higher prices than they otherwise would.

2. The National Aquarium operates "Maryland's largest paid tourist attraction"[1] selling over 1 million admission tickets per year.[2] The Defendant sells timed entry tickets — tickets which allow customers to visit at a specific date and time —on an online ticketing marketplace on

[1] https://aqua.org/about

[2] https://aqua.org/about/reports-and-financials/mission-impact

its website, aqua.org. Purchasing these tickets enables visitors to the National Aquarium to enter at a set time and to attend specific scheduled daily entertainment events on the premises.

3. Through its online ticketing marketplace, Defendant sells tickets to thousands of consumers who reside in Washington, D.C.[3] Each sale Defendant makes on its website is accompanied by an unavoidable, hidden $4.95 "Transaction Fee." A consumer cannot purchase a ticket on Defendant's website without paying this unlisted, surprise fee. By imposing this hidden charge, Defendant has extracted millions of dollars from consumers beyond the prices it advertised.

4. Defendant unlawfully advertised and displayed ticket prices on its websites without including all mandatory fees or charges that customers ultimately had to pay. Defendant uses a deceptively lower upfront price to lure consumers into the purchase process for tickets—the bait. Then, once Defendant has lured consumers into the transaction with a deceptively low price, Defendant adds a hidden "Transaction Fee" after the consumer had already relied on the low advertised price and made the decision to buy – the switch.

5. Stated differently, Defendant does not disclose its mandatory Transaction Fee until after a consumer has invested substantial time choosing a date and time, has considered whether to buy add on experiences, and had decided to purchase based on the advertised price after clicking through a multi-page checkout process. Each step in Defendant's multi-stage process is designed to deepen consumer commitment, so that by the time the fees are revealed, consumers—having

[3] The National Aquarium markets directly to Washington, D.C.-based consumers on its website, stating that the aquarium is "A Quick Trip from D.C." and "[w]hether you live in the nation's capital or are just visiting, the Aquarium is within easy reach, easily accessible from Washington, D.C., by car, MARC train or Amtrak." https://aqua.org/visit/visit-dc

already invested time and effort based on an incomplete understanding of the total cost—are more likely to complete the transaction even at a higher cost.

6. Accordingly, Plaintiffs bring this action individually and on behalf of all similarly situated Washington, D.C. consumers who purchased tickets from Defendant's website during the relevant statutory periods. Based on Defendant's unlawful conduct Plaintiffs seek damages, restitution, and reasonable attorneys' fees and costs for violations of the D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq*.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332. The putative class exceeds 100 members, the amount in controversy exceeds $5,000,000,[4] and at least one class member is a citizen of a state different from the Defendant.

8. The Court has personal jurisdiction over the Defendant because its principal place of business is in this District. Additionally, the claims arise from and are directed at pricing policies, practices, and decisions devised, approved and controlled by the Defendant operating from its headquarters in this District, and the Defendant processes and captures illegal fees in this District.

9. Venue is proper in this Court because Defendant resides in this District and a substantial portion of the occurrences and wrongdoing complained of herein occurred in this District.

## PARTIES

### Plaintiff Maura Matvey

10. Plaintiff Matvey is a natural person and a resident of the District of Columbia.

[4] On information and belief, the Defendant has sold at least 3,500 tickets to members of the putative class during the statutory period.

11. Plaintiff Matvey purchased tickets to the National Aquarium in August 2025, via the Defendant's website.

12. Plaintiff Matvey selected a specific date and time for her visit and a quantity of tickets. Included within the tickets was a per-ticket advertised price. At this point, having picked a specific number of tickets for entry to the National Aquarium for a specific date and time, Plaintiff Matvey selected the ticket for purchase by pressing the "Add to Cart" button. At the next screen, Plaintiff Matvey was offered additional add-on experiences. Only on the following screen was Plaintiff Matvey presented with the hidden Transaction Fee.

13. The ticket price advertised by Defendant to Plaintiff Matvey did not include the Transaction Fee.

14. Plaintiff Matvey was not aware that the tickets included the Transaction Fee when she first selected the tickets.

15. The deceptively low, initially advertised price was a substantial factor in Plaintiff Matvey's decision to purchase the tickets. As a direct result of Defendant's pricing practice, Plaintiff Matvey paid more than the price Defendant initially displayed—specifically, Plaintiff Matvey paid the mandatory 'Transaction Fee' in addition to the advertised ticket price. Had Defendant disclosed the full mandatory price, including the Transaction Fee, at the first price display, Plaintiff Matvey would not have completed the purchase at the higher total price later imposed in the purchase flow.

16. Defendant lured Plaintiff Matvey in with deceptively low initial prices, cultivating purchasing commitment based on that initial price. Defendant's purchase flow was designed to cultivate commitment to the transaction before disclosing mandatory fees, thereby dissuading comparison shopping, and increasing the conversion rate of Defendant's website.

17. Defendant intentionally did not include the Transaction Fee in the displayed and advertised prices of the tickets and only disclosed them once Plaintiff Matvey (and indeed all purchasers of tickets from Defendant's website) had spent time and mental energy selecting tickets, thereby increasing the likelihood that Plaintiff Matvey and those similarly situated would complete the purchase notwithstanding the higher total price.

18. Defendant did not disclose the true all-in mandatory price when Plaintiff Matvey made the key decision to select tickets and proceed through the transaction. Instead, Defendant withheld the Transaction Fee until the final stages of the purchase flow, after Plaintiff Matvey had already selected tickets, chosen a date and time, and invested time and effort in the transaction based on a lower, incomplete price. Once confronted with the newly disclosed mandatory fee, Plaintiff Matvey was forced either to abandon the transaction after expending time and effort in reliance on the lower, incomplete price or to complete the purchase by paying the higher total price Defendant had withheld until the end. Under those circumstances, Plaintiff Matvey's payment of the Transaction Fee was not the product of a fully informed or truly voluntary choice but was extracted through a purchase flow designed to induce consumers to proceed despite the higher total price.

19. Plaintiff Matvey expects to purchase aquarium tickets again in the future. Both price and value will factor significantly into Plaintiff Matvey's purchasing decision and the National Aquarium is one of the small number of local options that Plaintiff Matvey may consider. Accordingly, absent injunctive relief, Plaintiff Matvey faces a real and immediate risk of being misled again.

20. Plaintiff Matvey was a resident of the District of Columbia and physically present within the District of Columbia when she accessed the Defendant's website, saw the initial price,

developed purchase commitment based on that price, was confronted with the hidden fee just before completing the transaction, and ultimately completed the transaction.

**Plaintiff Benjamin Lagos**

21. Plaintiff Lagos is a natural person and a resident of the District of Columbia.

22. Plaintiff Lagos purchased tickets to the National Aquarium in September 2025, via the Defendant's website.

23. Plaintiff Lagos selected a specific date and time for his visit and a quantity of tickets. Included within the tickets was a per-ticket advertised price. At this point, having picked a specific number of tickets for entry to the National Aquarium for a specific date and time, Plaintiff Lagos selected the ticket for purchase by pressing the "Add to Cart" button. At the next screen, Plaintiff Lagos was offered additional add-on experiences. Only on the following screen was Plaintiff Lagos presented with the hidden Transaction Fee.

24. The ticket price advertised by Defendant to Plaintiff Lagos did not include the Transaction Fee.

25. Plaintiff Lagos was not aware that the tickets included the Transaction Fee when he first selected the tickets.

26. The deceptively low, initially advertised price was a substantial factor in Plaintiff Lagos' decision to purchase the tickets. As a direct result of Defendant's pricing practice, Plaintiff Lagos paid more than the price Defendant initially displayed—specifically, Plaintiff Lagos paid the mandatory 'Transaction Fee' in addition to the advertised ticket price. Had Defendant disclosed the full mandatory price, including the Transaction Fee, at the first price display, Plaintiff Lagos would not have completed the purchase at the higher total price later imposed in the purchase flow.

27. Defendant lured Plaintiff Lagos in with deceptively low initial prices, cultivating purchasing commitment based on that initial price. Defendant's purchase flow was designed to cultivate commitment to the transaction before disclosing mandatory fees, thereby dissuading comparison shopping, and increasing the conversion rate of Defendant's website.

28. Defendant intentionally did not include the Transaction Fee in the displayed and advertised prices of the tickets and only disclosed them once Plaintiff Lagos (and indeed all purchasers of tickets from Defendant's website) had spent time and mental energy selecting tickets, thereby increasing the likelihood that Plaintiff Lagos and those similarly situated would complete the purchase notwithstanding the higher total price.

29. Defendant did not disclose the true all-in mandatory price when Plaintiff Lagos made the key decision to select tickets and proceed through the transaction. Instead, Defendant withheld the Transaction Fee until the final stages of the purchase flow, after Plaintiff Lagos had already selected tickets, chosen a date and time, and invested time and effort in the transaction based on a lower, incomplete price. Once confronted with the newly disclosed mandatory fee, Plaintiff Lagos was forced either to abandon the transaction after expending time and effort in reliance on the lower, incomplete price or to complete the purchase by paying the higher total price Defendant had withheld until the end. Under those circumstances, Plaintiff Lagos' payment of the Transaction Fee was not the product of a fully informed or truly voluntary choice but was extracted through a purchase flow designed to induce consumers to proceed despite the higher total price.

30. Plaintiff Lagos expects to purchase aquarium tickets again in the future. Both price and value will factor significantly into Plaintiff Lagos' purchasing decision and the National Aquarium is one of the small number of local options that Plaintiff Lagos may consider.

Accordingly, absent injunctive relief, Plaintiff Lagos faces a real and immediate risk of being misled again.

31. Plaintiff Lagos was a resident of the District of Columbia and physically present within the District of Columbia when he accessed the Defendant's website, saw the initial price, developed purchase commitment based on that price, was confronted with the hidden fee just before completing the transaction, and ultimately completed the transaction.

**Defendant National Aquarium, Inc.**

32. Defendant National Aquarium, Inc., is a corporation registered under the laws of Maryland with its principal place of business in Maryland.

33. Defendant operates a ticketing marketplace, cart.aqua.org/webstore/ on its website, aqua.org to advertise and sell admission tickets to its venue.

## DRIP PRICING AND LATE DISCLOSED HIDDEN FEES ARE DECEPTIVE AND UNFAIR

34. Drip pricing is a bait and switch pricing technique "in which firms advertise only part of a product's price and reveal other charges later as the customer goes through the buying process."[5] In a drip pricing scheme mandatory fees — like those charged by Defendant — are foisted upon consumers after they have been lured in by a misleadingly low advertised price. These surprise fees have been dubbed "junk fees" by the Federal Trade Commission ("FTC").[6] Bait-and-switch junk-fee markups are particularly widespread amongst online ticket platforms.

[5] Trade Regulation Rule on Unfair or Deceptive Fees, Fed. Trade Comm'n (Jan. 2025), available at https://www.federalregister.gov/documents/2025/01/10/2024-30293/trade-regulation-rule-on-unfair-or-deceptive-fees

[6] The FTC classifies "junk fees" as "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer including goods or services that consumers would reasonably assume to be included within the overall advertised price" or fees that are "hidden," such as those "disclosed only at a later stage in the consumer's purchasing process or not at all." Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (codified at 16 C.F.R. pt. 464).

Research shows that consumers ambushed by hidden fees at checkout pay upward of twenty percent more than when the actual price was disclosed upfront.[7]

35. It is estimated that junk fees cost Americans over $90 billion each year.[8] Research has shown that consumers who are not provided the complete price until checkout are likely to proceed with their purchase even after the junk fee is revealed because they have already factored the deceptively low price into their decision and built purchasing commitment as they clicked through the transaction.

36. Research shows that consumers place stock in initial prices and tend to proceed with transactions even after exorbitant and unpredictable fees have been added despite their better judgment—despite the fact that continuing to search for cheaper prices would be more "optimal"—because consumers want to avoid "the cost of the time and cognitive effort involved" in continuing to search for a product or service.[9] Once consumers decide what to buy, they are unlikely to depart from that decision because of the "additional cognitive effort" involved in resuming their search.[10] Indeed, as companies that engage in junk fee practices are aware, consumers choose products or services based on the advertised "base price," and not based on the

[7] Morgan Foy, University of California-Berkley, Haas School of Business, "Buyer Beware: Massive Experiment Shows Why Ticket Sellers Hit You with Last Second Fees" (Feb. 9, 2021), https:// newsroom.haas.berkeley.edu/research/buyerbeware-massive-experiment-shows-why-ticketsellers-hit-you-with-hidden-fees-drip-pricing/ (concluding that consumer expenditure on tickets increased 21% when true price not disclosed initially).

[8] https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2024/04/24/readout-of-white-house-state-legislators-convening-on-junk-fees/

[9] Mary W. Sullivan, Economic Issues: Economic Analysis of Hotel Resort Fees, Bureau of Economics Fed. Trade Comm'n (Jan. 2017), at 16–17, https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf

[10] *Id.* at 17.

price inclusive of fees, which is obscured by partitions in the purchase flow.[11] In fact, studies show that "consumers exposed to drip pricing . . . are significantly more likely to 1) initially select the option with the lower base price, 2) make a financial mistake by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice."[12]

37. The FTC's Bureau of Economics has found that consumers are harmed by drip pricing because they are forced "either to incur higher total search and cognitive costs or to make an incomplete, less informed decision that may result in a more costly [transaction], or both."[13]

38. The FTC has characterized junk fees as especially harmful when they are hidden (i.e., disclosed only at a later stage in the purchasing process), because openly disclosed junk fees enable consumers to immediately determine that the cost of an item is not favorable relative to the cost charged by competitors and choose to do business elsewhere. As a result, the product or service listed by bad actors like the National Aquarium appears cheaper to consumers than competitors' products or services, even though the total cost of the product or service, inclusive of junk fees, is equally, if not more, expensive than those other companies' products or services.

39. Adding hidden junk fees after securing purchase commitment also generates significant burden for individual consumers, who, when confronted with drip pricing "pay upward

---

[11] Alexander Rasch et al., Drip Pricing & Its Regulation: Experimental Evidence, 176 J. Econ. Behavior & Org. 353 (2020), available at https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189?via%3Dihub (In controlled experiment, buyers "based their purchase decision exclusively on the base price."). *See also id. (*"buyers may be hurt" because "[w]hen there is uncertainty over possible drip prices . . . consumers more frequently fail to identify the cheapest offer."*)*

[12] Shelle Santana et al., (2020) Consumer Reactions to Drip Pricing. Marketing Science 39(1):188-210. https://doi.org/10.1287/mksc.2019.1207

[13] Mary W. Sullivan, Economic Issues: Economic Analysis of Hotel Resort Fees, Bureau of Economics Fed. Trade Comm'n (Jan. 2017), at 16–17, https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf

of twenty percent more than when the actual price was disclosed upfront."[14] By concealing the actual price of tickets, sellers like Defendant force consumers to spend "additional time" comparison shopping for tickets than they otherwise would which represents a cognizable injury.[15]

40. In sum, using bait-and-switch hidden fee tactics are bad for markets and bad for consumers.

**<u>THE DISTRICT OF COLUMBIA'S CPPA PROHIBITS DRIP PRICING</u>**

41. The D.C. Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 *et seq*. protects consumers in the District of Columbia against false, deceptive, or unfair business practices. It is a broad consumer protection statute, meant to "assure that a just mechanism exists to remedy all improper trade practices." D.C. Code § 28-3901(b)(1).

42. The CPPA "establishes an enforceable right to truthful information from merchants about consumer goods and services," and it is to be "construed and applied liberally" to effectuate that purpose. D.C. Code § 28-3901(c).

43. In relevant part, the CPPA provides that: "[i]t shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby, including to:… (e) misrepresent as to a material

---

[14] *See* Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011, supra n.4 (explaining that hidden junk fees therefore "impose substantial economic harms on consumers")

[15] *See e.g. Kahn v. Walmart Inc.*, 107 F.4th 585, 601 (7th Cir. 2024) ("Bait-and-switch pricing schemes like the one alleged here lead to injuries that consumers cannot reasonably avoid, which come in the form of higher prices and search costs."(internal quotations omitted); Tom Blake et al., (2021) Price Salience and Product Choice. Marketing Science 40(4):619-636. https://doi.org/10.1287/mksc.2020.1261 (A peer reviewed industry study, finding that drip pricing "makes price comparisons difficult and results in consumers spending more than they would otherwise" and that "users who weren't shown the ticket fees upfront ended up spending about 20% more money and were 14% more likely to complete [the transaction].").

fact which has a tendency to mislead; (f) fail to state a material fact if such failure tends to mislead; (f-1) use innuendo or ambiguity as to a material fact, which has a tendency to mislead; (h) advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered." D.C. Code § 28-3904 (e), (f), (f-1), (h).

44. "[T]he basic fact that [a defendant's] advertised ticket price is different than the final purchase price charged to the consumer constitutes a prima facie assertion of misrepresentation under the CPPA." *District of Columbia v. StubHub, Inc.*, 2025 D.C. Super. LEXIS 4, 12 (D.C. 2025) (citing *Grayson v. AT&T Corp.*, 15 A.3d 219, 226 (D.C. 2011)).

**DEFENDANT'S UNLAWFUL HIDDEN FEES**

45. Defendant has applied its Transaction Fee markup uniformly as to each of its website customers. Specifically, upon selecting the "Buy Tickets" button on Defendant's website, users are directed to Defendant's online ticket marketplace at https://cart.aqua.org/webstore/ and presented with a list of prices for general admission tickets by specific age groups. On that same screen, users are prompted to select a quantity of tickets. From there, a new screen pops up and users are prompted to select a date and time of entry. Next, users press the "Add to Cart" button and are prompted to a new screen which offers certain paid additional experiences. Only after selecting (1) a specific number of tickets, (2) at a specific price, (3) for a specific date and time, and (4) adding those tickets to their cart, and (5) accepting or declining additional experiences, are users like Plaintiff and the putative class members confronted with a hidden $4.95 Transaction Fee. Until this point-of-purchase screen, the amount of this fee is hidden from the customer.

46. As depicted in Figure 1 below, upon pressing the "Buy Tickets" icon users are presented with a list of ticket types, as well as the prices for those tickets. Users are prompted to select a quantity of tickets for purchase.




***Figure 1***

47. From there, customers encounter a new screen, shown at Figure 2 below, where they are prompted to choose the date and time of entry.




***Figure* 2**

48. After selecting the number of tickets at a specific price for a particular date and time, users are offered paid tours and experiences as depicted in Figure 3.




**Figure 3**

49. Only after selecting a number of tickets, a date, a time, picking any additional experiences, and being told the quoted ticket price and choosing to buy those tickets, are users

confronted with the Defendant's hidden "Transaction Fee" on top of the advertised price:




***Figure 4***

50. Complying with Washington, D.C.'s CPPA as to ticket pricing is straightforward: a company like Defendant must display and advertise a price of its goods or services that includes all mandatory fees. Defendant could have easily configured its website to list ticket prices inclusive of all mandatory fees. However, Defendant chose not to, precisely to take advantage of the fact that hiding the mandatory fees at the initial stages increases conversions from click-through browsing to ticket sales, even as it harms consumers, disadvantages honest competitors, and offends the law.

**<u>CLASS ACTION ALLEGATIONS</u>**

51. Plaintiffs Matvey and Lagos bring this action on their own behalf and on behalf of all persons similarly situated as a class action.

52. Plaintiffs seek to represent a class defined as:

> All persons within the District of Columbia who within the applicable statutory period, up to and including the date of final judgment in this action, purchased a ticket from https://cart.aqua.org/webstore/ or any other ticketing website controlled by Defendant where all mandatory fees were not included in the initially displayed or advertised price of the ticket.

53. Excluded from the Classes are Defendant, its corporate parents, subsidiaries, franchisees and affiliates, officers and directors, any entity in which Defendant has a controlling interest, and the legal representatives, successors or assigns of any such excluded person or entities, and the Court to which this action is assigned. Additionally, excluded is the Judge or Magistrate Judge presiding over this action, their staffs, and their families.

54. Plaintiffs reserve the right to amend or modify the description of the Classes with greater specificity or further division into subclasses or limitation to particular issues based upon discovery or further investigation.

55. ***Numerosity.*** The members of the Classes are so numerous that joinder of all members is impracticable. While the exact number of class members is currently unknown to Plaintiff, on information and belief the Classes are comprised of thousands of consumers throughout Washington, D.C. The precise number of members of the Classes and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by postal or electronic mail and/or publication through the Defendant's sales records.

56. ***Commonality.*** Common questions of law and fact exist for all members of the Classes and predominate over questions affecting only individual class members. Common legal and factual questions include, but are not limited to:

(a) Whether Defendant's conduct alleged above violated D.C. Code § 28-3901 *et seq*;

(b) Whether Plaintiff and the Classes are entitled to, and the amount of any, damages and/or restitution;

(c) Whether Defendant should be enjoined from further engaging in the misconduct alleged herein; and

(d) Whether Plaintiff and the Classes are entitled to attorneys' fees and costs.

57. ***Typicality.*** Plaintiffs' claims are typical of the claims of the Classes in that Plaintiffs, like all proposed members of the Classes, were exposed to Defendant's misrepresentations, purchased tickets on Defendant's website, and sustained damages from Defendant's uniform wrongful conduct, based upon Defendant's wrongful acts alleged herein.

58. ***Adequacy***. Plaintiffs will fairly and adequately protect the members of the Classes interests. Plaintiffs have no interest antagonistic to the members of the Classes' interests, and Plaintiffs have retained counsel that have considerable experience and success in prosecuting complex class actions and consumer-protection cases.

59. ***Superiority***. The class mechanism is superior to other available means for the fair and efficient adjudication of members of the Classes claims. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and

claimants are before this Court for consistent adjudication of the liability issues.

60. Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiffs and members of the Classes and will likely retain the benefits of its wrongdoing.

61. Based on the foregoing allegations, Plaintiffs' claims for relief include those set forth below.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violations of the D.C. Consumer Protection Procedures Act**
**D.C. Code § 28-3901 et seq.**
(*by Plaintiffs individually and on behalf of the DC Class*)

62. Plaintiffs Matvey and Lagos re-allege and incorporate by reference paragraphs 1 through 61 above.

63. The CPPA protects consumers in the District of Columbia against false, deceptive, or unfair business practices and establishes an enforceable right to truthful information about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia. D.C. Code § 28-3904.

64. The admission tickets and other services that Defendant provides consumers are for personal, household, or family purposes and therefore are consumer goods and services. D.C. Code § 28-3901 (3)(A)(7).

65. Defendant, in the ordinary course of business, supplies consumer goods and services and therefore is a merchant under the CPPA. *Id*. at 3(A).

66. Plaintiffs and the DC Class members are consumers protected by the CPPA because they purchased tickets from Defendant as consumer goods. *Id*. at (2)(A).

67. Defendant, in connection with marketing, promoting, selling, and supplying their goods and services, have engaged in misleading and deceptive trade practices in violation of the CPPA, including by:

a. Advertising ticket prices that do not include Defendant's mandatory Transaction Fee, in violation of D.C. Code § 28-3904(e);

b. Failing to adequately disclose material information to consumers concerning the true price of the tickets, in violation of D.C. Code § 28-3904(f);

c. Failing to adequately disclose the amount of the Transaction Fee at the outset of the transaction, which constitutes an ambiguity as to material facts that have the tendency to mislead and are deceptive trade practices, in violation of D.C. Code § 28-3904(f-1);

d. Advertising or offering goods or services without the intent to sell them at the advertised price, in violation of D.C. Code § 28-3904(h); and,

e. Misrepresenting material facts concerning the total mandatory price of its tickets by advertising ticket prices that omitted the mandatory Transaction Fee; failing to state material facts concerning the total mandatory price; and using ambiguity regarding mandatory fees in a manner that had a tendency to mislead, in violation of D.C. Code § 28-3904(e), (f), and (f-1).

68. By the acts and omissions alleged herein, Defendant has engaged in deceptive and misleading acts and practices designed to sell tickets at prices higher than it advertised and promised to consumers, and to covertly and improperly squeeze additional money from its customers to boost its revenue.

69. By reason of this conduct, Defendant has engaged and continues to engage in deceptive acts and practices in violation of the Consumer Protection Procedures Act, D.C. Code § 28-3901 et seq.

70. Defendant's deceptive acts, misrepresentations, and omissions were and are material, in that they were likely to mislead reasonable consumers under the circumstances by falsely representing the ticket price.

71. Defendant did not disclose the true all-in mandatory price when Plaintiffs made the key decision to select tickets and proceed through the transaction. Instead, Defendant withheld the Transaction Fee until the final stages of the purchase flow, after Plaintiffs had already selected tickets, chosen a date and time, and invested time and effort in the transaction based on a lower, incomplete price. Once confronted with the newly disclosed mandatory fee, Plaintiffs were forced either to abandon the transaction after expending time and effort in reliance on the lower, incomplete price or to complete the purchase by paying the higher total price Defendant had withheld until the end. Under those circumstances, Plaintiffs' payment of the Transaction Fee was not the product of a fully informed or truly voluntary choice but was extracted through a purchase flow designed to induce consumers to proceed despite the higher total price.

72. By the time Defendant first revealed its hidden fee, Plaintiffs had already invested time and effort in the transaction in reliance on a lower, incomplete price, making them less likely to abandon the purchase or comparison-shop elsewhere. Further, there is no benefit to consumers or competition from such practices, other than to increase Defendant's revenue.

73. As a direct and proximate result of Defendant's unfair and deceptive actions, Plaintiffs Matvey, Lagos and the DC Class members have been harmed and have lost money or property in the amount of the undisclosed mandatory fees that they paid to Defendant.

74. As a result of Defendant's unfair and deceptive actions and practices, Plaintiffs and the Class members have suffered damages and are entitled to recover actual damages, the greater of treble those damages or statutory damages in the amount of $1,500 per violation, punitive damages, and costs and attorneys' fees. D.C. Code § 28-3905(k)(2)(A)–(C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes pray for relief and judgment as follows:

A. For an order certifying this case as a class action and appointing Plaintiffs' counsel as Class Counsel;

B. For an order finding in favor of Plaintiffs and the Classes on all claims alleged herein;

C. For injunctive relief, actual, statutory, compensatory, disgorgement, and/or punitive damages in amounts allowed by law and/or to be determined by the Court and/or jury;

D. For prejudgment interest on all amounts awarded;

E. For an order of restitution and all other forms of equitable monetary relief appropriate by statute;

F. For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees expenses, and costs of suit as appropriate by statute; and

G. Awarding such other equitable or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims and issues so triable.

Dated: May 14. 2026

Respectfully Submitted,

_______________/s/___________________
BRANDY A. PEEPLES P.C. t/a PEEPLES LAW
Brandy A. Peeples, Esquire
Fed. Bar No. 27147
Brandy A. Peeples, P.C. t/a Peeples Law
47 East All Saints Street
Frederick, Maryland 21701
410-327-9614 (telephone)
866-277-7137 (facsimile)
brandy@peeples-law.com

/s/*Arun G. Ravindran*
**RAVINDRAN LAW FIRM PLLC**
Arun G. Ravindran*
arun@ravindranlaw.com
2525 Ponce de Leon Blvd., Suite 300
Coral Gables, Florida 33134

(**Pro Hac Vice forthcoming)*

*Counsel for Plaintiffs and the Putative Class*